## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DR. ROBERT BALL, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 10-cv-2474 |
| EINSTEIN COMMUNITY HEALTH | : | |
| ASSOCIATES, INC., et al., | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OF LAW

Joyner, C.J.                                    February 28, 2012

Before the Court are Defendants' Motion for Summary Judgment (ECF No. 26), Plaintiff's Response in Opposition thereto (ECF No. 30) and Defendants' Reply in further support thereof (ECF No. 31).  For the reasons set forth in this Memorandum of Law, the Motion is GRANTED.

## I. INTRODUCTION

The case under consideration is an employment discrimination suit arising under the Americans with Disabilities Act, 42 U.S.C. §§ 12111-17, Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34, and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. §§ 951-63.  Dr. Robert Ball ("Plaintiff") sues his former employer, the Einstein Community Health Associates, Inc. ("ECHA"), Dr. Steven Sivak, the ECHA Medical Director who supervised Dr. Ball, and Luann Trainer, ECHA Vice President of Physician Services (collectively, "Defendants") for allegedly terminating his employment due to his age and physical

disability.

## II.  FACTUAL BACKGROUND

Plaintiff Ball started working for ECHA in 1998 on a series of one- or two-year employment contracts.  In 2005, Plaintiff was told by the former medical director that his contract would not be renewed for allegedly poor performance.  In light of Plaintiff's protestations and the appointment of a new medical director, Dr. Steven Sivak, Plaintiff's contract was renewed that year and was renewed again for 2006, 2007 and 2008.  In 2008, Defendants Sivak and Luann Trainer "became increasingly concerned about Dr. Ball's performance in several areas . . . ."  (Defs.' Mem. Supp. Summ. J. 4, ECF No. 26.)  In late 2008, Sivak and Trainer informed Plaintiff that his employment contract ending in March 2009 would not be renewed.

Plaintiff contends that he was fired due to his advanced age--he was 73 years old at the time of his termination--and his physically debilitating affliction, Chronic Inflammatory Demyelinating Polyneuropathy.  Plaintiff alleges that Defendants targeted his medical documentation and the propriety of his drug prescription practices as a pretext for age and disability discrimination.

Defendants allege that part of Plaintiff's substandard performance dealt with his medical documentation and coding. Every patient's medical chart contains progress notes, written by the treating physician to document his or her medical

decisionmaking.[1]  A physician assigns a medical billing code,
called a current procedure terminology ("CPT") code, which
correlates to a dollar amount.  These codes are used to submit
reimbursement claims to health insurers and the progress notes
must substantiate the CPT code assigned by the physician.  A
sample of Dr. Ball's charts were reviewed for compliance in
March, May, September and November of 2008 and Dr. Ball failed
each such audit.[2]  (Hooten Dep. 69:16-20, June 28, 2011; Defs.'
Mem. Exs. M, N, R, S.)

Plaintiff maintains his chart audit results were never
shared with him prior to being notified his employment contract
would not be renewed.  Moreover, Plaintiff indicates that four
other doctors--Akiwumi (age 47), Hoellein (age 55), Goldwein (age
47) and Manin (age 43)--failed a chart audit but were not
terminated.  (Pl.'s Mem. Resp. Summ. J. 7-8, ECF No. 30.)
According to Plaintiff, Elizabeth Hooten, ECHA's Director of
Quality and Compliance, spoke to the four other doctors about
their progress note deficiencies but not to Plaintiff; instead,
his audit results were allegedly reported directly to Dr. Sivak.

---

[1]Progress notes describe the patient's complaints, medical history,
diagnosis and plan of treatment.  The notes are used to assist physicians in
future visits and to document the rationale and medical necessity of the
physician's prescriptions and treatments.

[2]Although the precise criteria for failure are not apparent from the
record, Dr. Ball's September 2008 audit revealed that five of the ten charts
reviewed lacked documentation to support the CPT code assigned and the
November 2008 audit indicated that five of the nine charts reviewed were
inadequately documented.  (Defs.' Mem. 8-9.)  Thus, "failure" seems to
indicate that roughly half of the charts reviewed lack documentation to
support the CPT code the physician assigned.

Plaintiff also contends that Dr. Hoellein and Dr. Akiwumi received one-on-one coding and documentation training from Ms. Hooten and Plaintiff did not.

Defendants point out that Plaintiff attended a training on billing and coding presented by Dr. Sivak in February 2008 and Plaintiff participated in a one-on-one training with ECHA Auditor Andrea McMillan in March 2008.  (Defs.' Mem. Ex. M; Pl.'s Mem. Ex. O.)  Additionally, after Plaintiff failed the May 2008 audit, Shauna Henley, ECHA's Manager of Coding and Compliance, reviewed the results with Plaintiff and conducted a one-on-one training on coding.  (Hooten Dep. 68-69; Defs.' Mem. Exs. M, O, P; Pl.'s Mem. Ex. O.)  In August 2008, Ms. Henley conducted another one-on-one training with Plaintiff on documenting medical decisionmaking and diagnosis selection.  (Defs.' Mem. Ex. M; Pl.'s Mem. Ex. O.)  On November 7, 2008, Dr. Sivak met with Plaintiff to review some of Plaintiff's charts, which Sivak noted were disorganized and the handwriting was illegible, and told Plaintiff he had not yet passed a coding audit.  (Ball Dep. 32, Jan. 10, 2010; Sivak Dep. 102-03, June 14, 2011; Defs.' Mem. Ex. T; Pl.'s Mem. Ex. Q.)

Plaintiff contends that he was singled out for his drug prescribing practices for writing more prescriptions for narcotics than other doctors.  ECHA has a policy to identify and remove from its practice "drug-seeking patients" who pursue narcotics prescriptions for personal abuse or illegal resale. Nancy Donohoe, the ECHA Training and Call Center Director,

initially requested a report of all prescriptions Plaintiff wrote for narcotics in June of 2008.[3]  (Pl.'s Mem. Ex. P.)  The ECHA Regional Practice Administrator, Tom Lubiski, then raised the potential "unfairness" of singling out Plaintiff and asked that the report include other doctors working at Plaintiff's office for comparison.  (Id.; Donohoe Dep. 32-33, June 28, 2011.)  The report revealed that 34.05% of Plaintiff's prescriptions were written for controlled substances, whereas other doctors had much lower proportions--anywhere from 6.3% to 19.57%.  (Defs.' Mem. Ex. X.)  Similar reports generated for the fourth quarter of the 2008 fiscal year and second quarter of the 2009 fiscal year indicated the same magnitude of disparity.[4]  (See Defs.' Mem. Ex. Y.)

Defendants do not deny that Plaintiff was initially "singled out" for his narcotics prescribing practices but they assert a legitimate, nondiscriminatory reason for doing so.  Maureen Finklestein, the office manager where Plaintiff worked, witnessed several of Plaintiff's patients exhibiting behaviors of drug-seeking patients.  (Finklestein Certification ¶ 2, Defs.' Reply Mem. Ex. II, ECF No. 31.)  Specifically, these patients were aggressively demanding narcotics prescription refills and causing

---

[3]ECHA physicians enter all prescriptions into Allscripts, a computer tracking system.

[4]ECHA's fiscal year begins in July.  Thus the fourth fiscal quarter of 2008 was April to June 2008 and the second quarter of the 2009 fiscal year was October to December 2008.

disruptions in the office.  Id.  These events lead to Finklestein
asking Donohoe to generate a report on Plaintiff's narcotics
prescriptions, the same report that ultimately included other
physicians at Lubiski's request.  Id.

Plaintiff alleges the Defendants wrongly accused him of
issuing duplicate prescriptions for narcotics to patients.  When
an Allscripts report indicated that nineteen of Plaintiff's
patients appeared to receive multiple narcotics prescriptions on
the same day, (Pl.'s Mem. Ex. Q,) Plaintiff explained that no
duplicate prescriptions were issued, rather, the Allscripts
system printed out duplicates that he then destroyed.  (Ball Dep.
32:24-33:13, 45:12-23.)  At Sivak's request, Donohoe conducted an
investigation of the Allscripts system and determined that
Allscripts did not generate duplicate prescriptions.  (Donohoe
Dep 44-45.)  Each entry had a unique identification number,
signifying that the prescriptions were entered into Allscripts
multiple times by Plaintiff.  Id.  When Plaintiff was told about
the investigation results, he clarified his explanation: he made
a mistake entering the prescription but did not know how to fix
it; instead he re-entered the prescription anew and destroyed the
erroneously printed prescription.  Sivak confirmed that
regardless of how many prescriptions were printed, Plaintiff's
patients were only *issued* a prescription once.  (Pl.'s Mem. Ex.
Q; Defs.' Mem. Ex. T; Hooten Dep. 75:12-76:11.)

Finally, Plaintiff challenges Defendants' assertion that he was not complying with ECHA's Pain Management Policy.  The policy requires physicians with patients who are prescribed narcotics, or other drugs subject to abuse, to refer patients to a pain management specialist who can evaluate the patient's need for that particular drug regimen.  Physicians are also required to periodically submit those patients to urinalysis to confirm the patient is using the drugs at the prescribed dosage and not abusing illicit drugs.[5]

Defendants assert that Plaintiff was not referring patients to a pain management specialist, not having patients sign the medication agreement and continuing his relationship with noncompliant patients.  (Hooten Dep. 84:5-12; Defs.' Mem. Ex. AA; Sivak Certification ¶¶ 10, 12, Aug. 3, 2011.)  Plaintiff argues that to the contrary, he referred patients to pain management specialists and refused to issue narcotics prescriptions to patients who failed to attend a pain management consultation or failed a urinalysis screening.  (Ball Dep. 36, 46-47, 51, 53.) Dr. S. Nadeem Ahsan, Director of the Einstein Pain Institute, attests that the patients of Plaintiff that he evaluated had drug prescriptions suitable to their diagnoses.  (Letter from S. Nadeem Ahsan, MD, Director, Einstein Pain Institute, to Robert

---

[5]Patients sign an agreement to consult with a pain management specialist and accede to urinalysis.  The consequences for breaching the agreement are suspension of the narcotics prescription or termination of the physician-patient relationship.

Ball, MD, Jan. 28, 2009, Pl's Mem. Ex. U.)[6]  Additionally, a
report showed that many of Plaintiff's patients receiving
narcotics prescriptions had upcoming appointments with pain
management specialists.  (Defs.' Mem. Ex. AA.)

### III.   STANDARD OF REVIEW

The Court shall grant a motion for summary judgment "if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  Facts are material when disputes over
them "might affect the outcome of the suit under the governing
law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
A dispute is genuine where "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Id.  "The mere existence of a scintilla of evidence in support of
the plaintiff's position will be insufficient; there must be
evidence on which the jury could reasonably find for the
plaintiff."  Id. at 252.  The Court must "draw all reasonable
inferences in favor of the nonmoving party" and "not make
credibility determinations or weigh the evidence."  Reeves v.
Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  "The
party opposing summary judgment "may not rest upon the mere
allegations or denials of the . . . pleading; its response, by

---

[6]Defendants argue that Dr. Ahsan's letter is inadmissible hearsay.  This
may be true but the substance of the letter presumably reflects the testimony
Dr. Ahsan would give at trial.  See Shelton v. Univ. of Med. & Dentistry, 223
F.3d 220, 223 n.2 (3d Cir. 2000).

affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (first alteration in original) (internal quotation marks omitted).

## IV.  ANALYSIS

Plaintiff alleges his termination was motivated by unlawful age and disability discrimination and sues pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12111-17, Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34, and the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. §§ 951-63. To prevail on his discrimination claim, Plaintiff must prove that his age or disability "actually motivated or had a determinative influence on the employer's adverse employment decision." Fasold v. Justice, 409 F.3d 178, 184 (3d Cir. 2005) (internal quotation marks omitted).  Absent direct evidence of discrimination, Plaintiff can meet his burden by presenting indirect evidence of discrimination.  Id.  The analysis under all three statutes is the same; the Court applies the three-step framework first established in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (citing Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156-57 (3d Cir. 1995).

Under the McDonnell Douglas framework, the plaintiff must first articulate a prima facie case of discrimination.  See,

e.g., Fasold, 409 F.3d at 184.  Then the burden of production
shifts to the defendant-employer to establish a legitimate,
nondiscriminatory reason for its adverse employment decision.
Id.  The plaintiff must then "proffer evidence that is sufficient
to allow a reasonable finder of fact to find by a preponderance
of the evidence that the employer's proffered reasons are false
or pretextual."  Id.  Although the burden may shift throughout
the inquiry, the burden of persuasion remains at all times with
the plaintiff to prove the defendants intentionally discriminated
against the plaintiff.  Id.

Plaintiff has established a prima facie case of age and
disability discrimination.  See, e.g., id.; Taylor, 184 F.3d at
306.  Moreover, Defendants stipulate to the same for the purposes
of their summary judgment motion.  Defendants articulate three
legitimate, nondiscriminatory reasons for terminating Plaintiff.
First, Plaintiff failed several audits for proper billing coding
and chart management.  Second, Plaintiff had questionable
narcotics prescription writing practices.  Specifically, turmoil
was generated by what Defendants thought were duplicate narcotics
prescriptions issued to the same patients on the same day and
Plaintiff's abnormally high proportion of narcotics
prescriptions.  Third, Plaintiff was not in compliance with
ECHA's pain management policy.  In agreement with both parties,
the Court finds that Defendants have met their burden of

production as to the second step of the <u>McDonnell Douglas</u>
framework.

Now that the burden of production has rebounded to
Plaintiff, he must show "some evidence, direct or circumstantial,
from which a factfinder could reasonably either (1) disbelieve
the employer's articulated legitimate reasons; or (2) believe
that an invidious discriminatory reason was more likely than not
a motivating or determinative cause of the employer's action."
<u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).  As
explained below, Plaintiff has failed to sustain his burden.

## A.  Defendants' Legitimate, Nondiscriminatory Reasons Must Be Credible

Plaintiff has not provided evidence such that a reasonable
factfinder could discredit Defendants' legitimate reasons for
terminating Plaintiff's employment.  To rebut the defendants'
legitimate reasons, the plaintiff's evidence must "allow a
factfinder reasonably to infer that *each* of the employer's
proffered nondiscriminatory reasons was either a *post hoc*
fabrication or otherwise did not actually motivate the employment
action."  <u>Id.</u> (citations omitted).  As the Third Circuit has
explained:

> [T]he plaintiff cannot simply show that the employer's
> decision was wrong or mistaken, since the factual dispute
> at issue is whether discriminatory animus motivated the
> employer, not whether the employer is wise, shrewd,
> prudent, or competent. Rather, the non-moving plaintiff
> must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the
> employer's proffered legitimate reasons for its action

> that a reasonable factfinder *could* rationally find them
> unworthy of credence and hence infer that the employer
> did not act for [the asserted] non-discriminatory
> reasons.

Id. at 765 (citations and internal quotation marks omitted).

Plaintiff first challenges Defendants' supposed contention that "despite repeated training, Dr. Ball demonstrated no improvement in coding." (Pl.'s Mem. 23.)  However, the record indicates Defendants agree that Plaintiff's coding was improving; his deficiency was that he failed to ever once pass an audit despite his improvement. (See Email from Shauna Henley to Defendant Sivak, Dec. 31, 2008, Pl.'s Ex. O; Sivak Cert'n ¶ 8; Ball Dep. 57:16-20.)  It is an uncontested fact that Plaintiff failed all of his coding audits and he was the only such ECHA physician to do so. (See Sivak Cert'n ¶ 8.)

Next, Plaintiff argues Defendants wrongly assert that Plaintiff "was writing duplicate prescriptions on the same day for the same patient, and that his prescribing practices were improper." (Pl.'s Mem. 23-24.)[7]  Plaintiff admittedly printed duplicate prescriptions but explained this was done in error, which he promptly remedied by having the errant duplicate prescription destroyed. (Ball Dep. 32:24-33:13, 45:12-23.)[8]

---

[7] Without delving into the semantics extensively, no prescription was ever "written" by the precise definition of the word. Rather, Plaintiff would type the prescription information into the Allscripts computer system, causing a computer-generated prescription to be printed that would then be issued to the patient.  This process of entering prescription information into Allscripts system appears to be what Defendants mean by "writing" prescriptions. (See Defs.' Mem. 12-13.)

[8] Plaintiff appears to equate "writing" a prescription with physically issuing the printed prescription to the patient.

In either case, Defendants' assertion is uncontroverted: on numerous occasions Plaintiff entered a patient's prescription information into the Allscripts system multiple times and printed multiple prescriptions. (Id.; Email from Defendant Sivak to Maureen Finklestein, Nov. 25, 2008, Pl.'s Mem. Ex. R; Email from Plaintiff to Defendant Sivak, Dec. 4, 2008, Pl.'s Mem. Ex. S.) This was a problem never known to happen to any other physician. (Sivak Cert'n ¶¶ 9, 12.)  Whether or not Defendants believed Plaintiff's explanation for what happened to the printed prescriptions, the evidence shows Plaintiff did in fact, on occasion, generate and print multiple prescriptions for the same patient on the same day.  There is no contradiction.  Defendants were not required to accept Plaintiff's explanation for the errors, even if their decision was wrong.  See Fuentes, 32 F.3d at 765.  Moreover, the very fact Plaintiff was entering erroneous prescriptions in the Allscripts system is a legitimate, nondiscriminatory reason to terminate Plaintiff's employment.

Lastly, Plaintiff refutes Defendants' contention that he was not complying with ECHA's pain management policy.  Plaintiff submits that he was following the policy. (See Ball Dep. 36, 46-47, 51, 53; see also Email from Maureen Finklestein to Defendant Sivak, Sept. 29, 2008, Pl.'s Mem. Ex. T; Hooten Dep. 99-100; Ahsan Letter, Pl.'s Mem. Ex. S.)  There is a genuine disagreement as to whether or not Plaintiff was complying with the policy, therefore, for purposes of summary judgment, the Court assumes

that a reasonable factfinder would agree with Plaintiff that he
was substantially compliant.[9]  Given the many facets of the pain
management policy and that both parties can cite to instances
where Plaintiff did or did not comply with the policy, Plaintiff
can prove, at best, that Defendants were mistaken in their
assessment of Plaintiff's substantial compliance--not that their
reason was "unworthy of credence."  Even if a factfinder were to
conclude Defendants' contention lacks credibility, Defendants are
entitled to summary judgment because they have alleged other
credible and legitimate grounds for terminating Plaintiff's
employment.  See Fuentes, 32 F.3d at 764.  Plaintiff has failed
to proffer sufficient evidence to allow a reasonable factfinder
to conclude Defendants' legitimate, nondiscriminatory reasons
lack credibility.


B.  Plaintiff Failed to Show Discrimination Was More Likely Than
Not a Determinative Cause of His Termination

     Plaintiff can defeat a motion for summary judgment by
"adducing evidence, whether circumstantial or direct, that

---

[9]The parties do not agree on what "compliance" means in terms of
following the strictures of the pain management policy.  Plaintiff had
countless interactions with dozens of patients that required him to act in
accordance with the policy and on at least a few occasions, he may not have
been in precise compliance.  Likewise, Defendants have not demonstrated what
level of compliance was required for an ECHA physician to be considered
compliant with the policy.  Plaintiff cites evidence showing he was acting in
accordance with the policy at least some of the time.  His own deposition
includes general assertions of compliance but does not describe his compliance
in specific detail.  The best showing Plaintiff can make based on the evidence
is that he was substantially, but not absolutely, in compliance with the pain
management policy.

discrimination was more likely than not a determinative cause of the adverse action." Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 277 (3d Cir. 2010) (citing Fuentes, 32 F.3d at 764) (alterations omitted).  Amongst the several ways to do this, the plaintiff can prevail by showing the defendants "treated other, similarly situated persons not of his protected class more favorably." Id. (citing Fuentes, 32 F.3d at 765).

Plaintiff asserts he was unfairly singled out when his drug prescribing practices were scrutinized.  Plaintiff correctly points out that "Ms. Donohoe was asked to run a report of Allscript records for only Dr. Ball and for no other ECHA physician." (Pl.'s Mem. 21 (emphasis omitted).)  On August 13, 2008, Finklestein, the office manager, emailed Donohoe, ECHA's Training and Call Center Director, to request a report on Plaintiff's prescription history. (See Email from Maureen Finklestein to Nancy Donohoe and Tom Lubiski, Aug. 13, 2008, Pl.'s Mem. Ex. P.)  Plaintiff's situation was unique.  The uncontroverted facts show Finklestein's request resulted from several instances in which Plaintiff's patients entered the office and aggressively demanded narcotic prescription refills or exhibited other characteristics of drug seeking patients. (Finklestein Cert'n ¶ 2.)  Plaintiff does not present evidence showing that other physicians were similarly situated. Therefore, Plaintiff cannot prove that Defendants "treated other,

similarly situated persons not of his protected class more favorably." <u>Anderson</u>, 621 F.3d at 277.

Defendants allegedly singled out Plaintiff because "only Dr. Ball's patients were tracked to see if the protocol referring patients to the pain management practice was complied with." (Pl.'s Mem. 21.)  Again, while Plaintiff is right that he was singled out, no other physician was similarly situated.  Not only were Plaintiff's patients the only ones who appeared to be drug-seeking patients, the prescription drug report that Donohoe compiled revealed that Plaintiff was prescribing narcotics in substantially greater proportions than other doctors.  (<u>See</u> Defs.' Mem. Ex. X.)  In June 2008, 36.09% of Plaintiff's prescriptions were for narcotics, whereas other physicians prescribed narcotics at rates of 6.3% to 19.57%.  (<u>See</u> <u>id.</u>; Sivak Cert'n ¶ 9.)  Other reports confirmed that Plaintiff consistently prescribed narcotics in substantially greater proportions than his peer physicians.  (See Defs.' Mem. Ex. Y.)[10]  Defendants

---

[10]It is unclear whether the percentages reported include or exclude the prescriptions that Plaintiff accidentally entered into the Allscripts computer system.  Including the presumably erroneous entries would inflate the percentage of narcotics prescriptions.  Making the inference favorable to Plaintiff, the Court assumes the percentages generated in Donohoe's reports are so inflated.  (See Defs.' Mem. Exs. X, Y.)  Plaintiff's narcotics prescriptions exceeded the next highest level for any doctor by 14.48% and 11.64%, respectively.  <u>See</u> <u>id.</u>  Although the degree of inflation cannot be precisely calculated with the data presented, the inflation does not appear to be sufficient to account for Plaintiff's uniquely high proportion of narcotics prescriptions.  Donohoe created a report identifying 155 prescriptions from July to September, 2008 that may be duplicates.  (Defs.' Mem. Ex. EE.)  Assuming all 155 prescriptions were entered in error (an assumption the Court realizes stretches the bounds of reasonability but favors Plaintiff), this would account for only 4.32% of all the prescriptions written in April through June 2008 or 5.26% of all the prescriptions written in October through December 2008 (data are missing for July through September).  Thus it appears that Plaintiff's duplicate prescriptions alone cannot account for his uniquely

Sivak and Trainer, when presented with these reports, were justifiably concerned about Plaintiff's prescribing practices, including whether or not he was complying with ECHA's pain management policy.

Plaintiff contends that younger, non-disabled physicians failed documentation and coding audits but were treated differently.  Plaintiff identifies Drs. Akiwumi, Hoellein, Goldwein and Manin as physicians who, like Plaintiff, failed an audit but who, unlike Plaintiff, were permitted to remain employed at ECHA.  Plaintiff points out that he was the only doctor of the five with whom Hooten did not review the audit results.  (Pl.'s Mem. 22; see Hooten Dep. 45-46.)  While this may be true, Plaintiff was afforded opportunities to review his audit results with ECHA personnel, just the same as the other four physicians.  An email exchange between Defendant Sivak and Shauna Henley, ECHA's Manager of Coding and Compliance, indicates Plaintiff's "follow up education [was] done with Andrea [McMillan] in March 2008."  (Defs.' Mem. Ex. M; Pl.'s Mem. Ex. O; see also Trainer Dep. 44:13-45:1, 67:22-68:18.)

Next, Plaintiff cites evidence that Hooten provided training to Hoellein and Akiwumi but not Plaintiff.  (Hooten Dep. 45:23-46:6.)  What Plaintiff fails to mention is that he was trained multiple times on medical documentation and coding in the time preceding and succeeding the first audit.  Plaintiff received

greater proportion of narcotics prescriptions.

training in February 2008 (Sivak Cert'n ¶ 6), March 2008 (Defs.'
Mem. Ex. M; Pl.'s Mem. Ex. O), May 2008 (Defs.' Mem. Exs. O, P)
and August 2008 (Defs.' Mem. Ex. M; Pl.'s Mem. Ex. O).  Plaintiff
received training and support on medical documentation and coding
like every other ECHA physician.

        Plaintiff also notes that of all the ECHA physicians who
failed an audit, he was the only one who was terminated.  What
Plaintiff omits is that those other physicians managed to
eventually pass an audit and Plaintiff failed more audits than
any other physician.  (Sivak Cert'n ¶ 8.)  Also, Plaintiff's
deficient charts were only one of several grounds that Defendants
deemed to be substandard performance.  Plaintiff has failed to
present evidence permitting a reasonable factfinder to conclude
Defendants' legitimate reasons were a pretext for discrimination.


**V.   CONCLUSION**

        For the reasons so mentioned, Defendants' Motion for Summary
Judgment is granted.